# Richmond

## A. B. RUDDOCK v. CITY OF RICHMOND.

January 17, 1935.

Reheard January 16, 1936

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore* and *Irving G. Craig,* for the plaintiff in error.

*James E. Cannon,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The plaintiff in error is complaining of a final order entered May 25, 1933, in a proceeding whereby the City of Richmond had sought to acquire a certain portion of his lands by condemnation for the purpose of improving navigation in the James river.

The United States Government, through the proper agency, authorized the straightening of the James river between Richmond and Hopewell by the construction of cut-off canals across Turkey island, Jones' neck, Dutch gap and Aiken swamp. The plan called for a channel three hundred feet wide and twenty-five feet deep from Hopewell to the deep water terminal at Richmond and from the latter point to the Richmond lock gates, a channel two hundred feet wide and eighteen feet deep. The chief of engineers, in his report, estimated the cost of the work to be $4,555,000, with an annual maintenance cost of $100,000. The said report concludes: "* * * subject to the provisions that local interests shall furnish all necessary rights of way and spoil-disposal areas, and give assurances satisfactory to the secretary of war and the chief of engineers that they * * * will hold and save the United States free of any and all claims for damages resulting from the cut-offs * * *."

On July 3, 1930, Congress approved the plan by an act (46 Stat. 922, sec. 1) and specifically authorized the improvement of James river in accordance with the report submitted in House document numbered 314 of the Seventy-first Congress, second session, subject to the conditions set forth in said document; "Provided that no expense shall be incurred by the United States for the acquiring of any lands required for the purpose of this improvement * * *."

The General Assembly of Virginia at its 1930 Session (chapter 227) approved an amendment to section 19-f of the charter of the City of Richmond, which extended the jurisdiction of the city to improve navigation in the James

river for twenty miles from the corporate limits. The city, by the act of the General Assembly, was granted the power to "improve and keep in good, safe and navigable condition, James river * * * and to that end, may acquire by condemnation or otherwise, all lands or interests therein, deemed necessary by the council for the improvement of James river and the improvement of navigation * * * may acquire lands for the construction of canals or the widening of the river, and may hold such lands for such purpose, or lease, sell or otherwise dispose of same for the better improvement of James river, the maintenance of navigation, and to improve the harbor facilities * * *."

On May 15, 1931, the City of Richmond, through its council, adopted the following joint resolution:

"BE IT RESOLVED BY THE COUNCIL OF THE CITY OF RICHMOND, THE BOARD OF ALDERMEN CONCURRING:

"That the city attorney be and he is hereby authorized and directed to acquire by gift, purchase or condemnation, the necessary lands for the construction, maintenance and operation of canals and for the widening, straightening and improvement of James river for the maintenance, improvement and development of navigation and harbor facilities therein, including lands for the disposal of material in dredging, deepening and straightening the channel of said river and lands for the disposal of material in the construction, maintenance, operation and dredging of said canals; the exact location, metes and bounds of all of which are shown upon a plan on file in the office of the director of public works, entitled: 'Map of James river from Richmond to City Point showing proposed cut-off and spoil areas,' marked 'Drawing No. P-3105,' and are also shown on blueprint copy of said plan attached to the draft of this resolution, the said land to be acquired for canals and for widening and straightening said river being shown on said blueprint enclosed in red lines, the lands for the disposal of material in

dredging, deepening and straightening the channel of said river being shown on said blueprint shaded in orange, and the lands for the disposal of material in the construction, maintenance, operation and dredging of said canals being shown on said blueprint shaded in yellow; but no concluded action shall be taken in the premises until the prices at which said lands can be acquired shall have been reported to the committee on finance, who are hereby given authority to reject said prices or recommend acceptance, nor until said recommended prices, or in place thereof, the condemnation awards, shall have been transmitted by the committee on finance to the council of the City of Richmond for action thereon."

In passing, the evidence shows that the map designated as P-3105 and upon which the city council based its resolution, was made in 1931, from information gathered by the engineers of the United States several years prior to these proceedings. One witness in answer to the question that the map might have been made from surveys of twenty-five years ago, said "that is possible." The city attorney practically concedes that the surveys were made twenty-five years ago. The evidence also shows that this map purports to show the improvement contemplated from Hopewell to Richmond, which is a distance of twenty-five miles. It neither shows the acreage to be taken, nor the metes and bounds of the lands desired. It shows no elevations. It was described in the evidence as a "small scale drawing and subject to such inaccuracies in minor details as can be shown on such a small scale."

Ruddock, the plaintiff in error, owns about 4,500 acres and the James river flows on approximately three sides of his lands. After unsuccessful negotiations with him in relation to the acquisition of such of his lands as were needed for the purpose of the improvement of navigation in the river, the city instituted the condemnation proceedings which are before us for review.

During the negotiations with Ruddock, through his representative, the city had claimed that it needed two par-

cels of Ruddock's land; one parcel of 88.60 acres for spoil disposal site for material dredged from the proposed canal through Turkey island and the other parcel of 131.5 acres for the purpose of dumping the material dredged from the channel of the river. The negotiations were conducted by correspondence and enclosed with one of the letters from the city was another drawing known as P-3242 which showed on a larger scale the lands now in controversy. A little later the city attorney advised Ruddock's counsel that an easement in the areas would be all that would be required and that the two areas needed for spoil purposes had been reduced; the area for canal dredging material would be 47 acres instead of 88.60 and the area for channel dredging material would be 85 acres instead of 131.5.

All negotiations to acquire the interests by purchase failed and on December 3, 1931, the city filed its petition to condemn the interests needed. Along with the petition were filed as exhibits, a copy of the joint resolution of council which has previously been set out, the map known as P-3105, and the revised map known as P-3242 showing the reduced spoil areas in which an easement was sought and not the fee.

Ruddock answered the petition. He asserted that the lands shown on the map known as P-3242, filed with the petition, were not the same lands which the city council had, by its joint resolution, directed the city attorney to acquire; that those lands were shown on P-3105, which map was incorporated in the resolution and that neither map showed the profile of the cuts and fills proposed to be made on the lands of Ruddock, as required by Virginia statutes.

Later the petition of the city was amended and filed and with it was filed an amended drawing showing elevations to which the materials would be raised on the spoil areas. In answer to Ruddock's claim that the lands authorized to be taken by the resolution were not the same lands as those embraced in the petition the city

claimed that the plats of the lands, in which an easement was sought, were made by the director of public works of the city, at the request of the city attorney; that the city attorney was authorized to have them made and that he was, by the joint resolution, authorized to acquire by condemnation the necessary rights in order to improve navigation in James river.

Ruddock filed his answer to the amended petition. He also moved the court to dismiss the petitions on the ground that the joint resolution of council, approved May 15, 1931, did not authorize the condemnation of the lands sought to be acquired in these proceedings. Testimony was heard by the court in connection with the motion, but the court overruled the motion and this is made the basis of the first assignment of error. Commissioners were appointed and after receiving instructions from the court, made their report, which was promptly excepted to, but later was confirmed.

The question which is determinative of the case is raised by the first assignment of error. Other assignments made are not reached in this case. One of them will, however, be discussed in the companion case of *Oliver et als.* v. *City of Richmond*, ante, page 538, 178 S. E. 48.

Under the first assignment of error it becomes necessary to decide whether the trial court should have sustained the motion of the plaintiff in error and should have dismissed the petition and amended petition as to him on the ground that the joint resolution of the city council, approved May 15, 1931, did not authorize the condemnation of the property sought to be acquired of him in this proceeding.

Under the amended charter provision which has already been referred to, the city was granted the power to improve the navigable condition of the James river within the corporate limits of the city and within twenty miles thereof. For that purpose, the city was granted power by the General Assembly to condemn all lands and interests therein deemed necessary by the city council. Acting

under this legislative authority the city council adopted the joint resolution of May 15, 1931, which has previously been set out. The lands of Ruddock were "deemed necessary" by the city council as expressed in the said resolution. The exact location, metes and bounds and the quantity of his lands "deemed necessary" by the city council were shown upon a plan on file in the office of the director of public works, and designated "drawing No. P-3105," a blueprint of which was attached to the resolution. The resolution described the lands necessary for cutting the canals as those shown on the map within the red lines; those lands necessary for spoil area for the materials dredged out of the channel of the river as those shown on the map shaded in orange, and those lands necessary for spoil area for the materials dredged from the canal as those shown on the map shaded in yellow.

There was no other resolution of the city council in this regard, and it was not "deemed necessary" to acquire any other lands or interest therein. The lands required by the city council are those, and those only, which are shown on the map known as P-3105. Other maps are found in the record and referred to in the briefs, but they formed no part of the resolution.

The lands in which the easement was sought in *these proceedings* were those shown on the map designated P-3242. This map was filed with the petition to condemn but it was not referred to in the resolution of council.

It is the contention of the plaintiff in error that the lands shown on map, P-3105, are not the same as those shown on map, P-3242; that map P-3242 shows substantially different lands from those shown on P-3105 and as to those lands, which are not embraced in map P-3105, but which are shown on P-3242, there has been no authorization from the city council to take by condemnation. It is further contended that an easement is being sought in the spoil area which has been substantially reduced without authorization from the city council.

An inspection and comparison of the two maps, P-3105

and P-3242, respectively, in the light of the testimony of those who made them shows that the lands sought in *these proceedings* are substantially different from those described in the *resolution* of the city council as the lands "deemed necessary." Bearing in mind that the lands sought in *these proceedings* are those shown on P-3242 and the lands authorized to be taken by the city council are those shown on P-3105, an inspection of the two maps discloses that there is substantial additional land embraced in P-3242 which is not embraced in P-3105. At a point some 2,200 feet from the northwest end of the lands the width of the land as shown on P-3242 is about 900 feet while the width of the land shown on P-3105 is only 625 feet. Therefore, there is land shown on P-3242 that is not shown on P-3105, and for which there has been no authorization from the city council to condemn.

Another substantial difference in the land authorized by the city to be condemned and that which is actually being condemned is the abandonment of a strip of land 700 or 800 feet wide and nearly a mile long on the river. One witness said that the strip was only 2,800 feet, but the map shows its length to be approximately a mile. The abandonment of this strip has never been authorized by the city council. It was done by the city attorney and the engineers who exercised their own judgment in releasing this strip of land from condemnation.

In the case of *City of Richmond* v. *Carneal et al,,* 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341, which is so much relied upon by the city here, the constitutionality of an act of the General Assembly whereby the city was granted power to condemn land on either side of a street was involved and the court held that so much of the act as permitted the city to take lands in excess of those actually required for an eighty foot street was unconstitutional. It appears to us that the *Carneal Case* is not in point. In that case the landowners were complaining that the excess land was not needed for a public use. No such claim is made by the landowner in the case at bar. Here the

landowner is complaining because the city attorney is seeking to condemn lands that *were not* "deemed necessary" by the city council and that he has released lands from condemnation that *were* "deemed necessary" by the city council. In other words, the lands to be acquired under the resolution of the city council are not the same lands which are being acquired by the condemnation.

The power to condemn Ruddock's land resided solely and exclusively in the city council. The charter amendment (section 19-f) placed the power there. No authority was conferred upon the city council to delegate the power. The language used in the charter amendment "The said city shall also have the power to * * * acquire by condemnation * * * all lands or interests therein, deemed necessary by the council, * * *" is plain and unambiguous. It needs no construction. It clearly lodges with the city council the exclusive power to condemn the lands of Ruddock.

If the resolution of the city council is an attempt to delegate the power of eminent domain to the city attorney, such delegation cannot be justified under section 19-f of the city charter, nor under the general law of the land.

In the petition, the quotation taken from 10 R. C. L. under the title, Eminent Domain, sec. 158, is a clear statement of the law on the subject of delegating the power of eminent domain. The latter part of the section follows: "When the power of selecting property to be taken for a public use is granted by the legislature to a particular board of public officers it must be exercised by them personally; the officers cannot delegate to an engineer or other subordinate the discretion conferred on them by law." The case of *Lyon* v. *Jerome,* 26 Wend. (N. Y.) 485, 37 Am. Dec. 271, is cited to support the text.

In 20 C. J., pages 545 and 546, this is found: "When the legislature delegates the right to exercise the power of eminent domain the grantee of the power cannot surrender, transfer or redelegate the same to another unless

expressly authorized by the statute conferring the power
* * *." This quotation is also found in the petition and
it is supported by cases from many States.

Another pertinent reference is found in 1 Lewis Emi-
nent Domain (3d Ed.) p. 687, where this is said: "When
authority to take property by virtue of the power of emi-
nent domain is conferred by the legislature, it becomes a
personal trust, and cannot be delegated or transferred,
except by legislative sanction."

■ A well-established rule which is also applicable
here is that an act of the legislature delegating to a mu-
nicipality the power of eminent domain must be strictly
construed in favor of the landowner.

■ Again, the general rule which applies in cases of
this kind is that the question of expediency, necessity and
propriety of resorting to the exercise of the power of emi-
nent domain is a legislative and not a judicial question,
in the absence of a constitutional provision to the con-
trary. These two latter rules are so well recognized in
Virginia that they need no citation of authority to sup-
port them.

■ The City of Richmond, through its city council, de-
clared the necessity of acquiring the lands of the plaintiff
in error for the improvement of navigation in the James
river. It spoke through the resolution of May 15, 1931.
The city council thereby decided that those lands shown
and described on the map known as P-3105 were neces-
sary for said purpose, and acting under the act of the
General Assembly (section 19-f of the charter) the city
resorted to its power of eminent domain. The city coun-
cil designated the lands it deemed necessary for the im-
provement but in enforcing the right of eminent domain
the city attorney not only added other lands to the lands
the city council had authorized to be taken, but a portion
of those lands which the city council had directed him to
acquire in the condemnation proceeding were abandoned.
We think the city attorney was bound by the resolution

of the city council and that he was directed to acquire the lands shown on the map, P-3105, and none other.

The case is remanded to the trial court for further proceedings not in conflict with the views herein expressed.

*Reversed and remanded.*

Upon Petition for Rehearing, Richmond, January 16, 1936.

Present, All the Justices.

CAMPBELL, C. J.:

The plaintiff in error filed a petition to rehear the judgment of this court rendered on January 17, 1935, ante, page 552, 178 S. E. 44.

A rehearing was granted and the case reargued at the November, 1935, term of the court. Upon a careful consideration of the questions involved upon the rehearing, we are constrained to adhere to our former opinion, and the judgment of the circuit court is therefore reversed and remanded.

*Reversed.*